1Lt. Ehren K. WATADA, Petitioner,

v.

Lt. Col. John HEAD, Military Judge, Army Trial Judiciary, Fourth Judicial District; Lt. Gen. Charles Jacoby, Convening Authority, Ft. Lewis, Washington, Respondents.

No. C07–5549BHS.

United States District Court,
W.D. Washington,
at Tacoma.

Nov. 8, 2007.

James E. Lobsenz, Kenneth S. Kagan, Carney Badley Spellman, Seattle, WA, for Petitioner.

Brian C. Kipnis, US Attorney's Office, Seattle, WA, for Respondents.

## ORDER ISSUING PRELIMINARY INJUNCTION OVER COURT MARTIAL PROCEEDING PENDING OUTCOME OF HABEAS CORPUS PETITION

BENJAMIN H. SETTLE, District Judge.

This matter comes before the Court on Petitioner's Emergency Motion for a Stay of Court–Martial Proceedings (Dkt.2). Previously, the Court granted a temporary stay over the court martial proceeding referred by Respondent Jacoby and requested additional briefing. The Court has considered the pleadings filed in support of and in opposition to the motion and the oral arguments of counsel, and hereby grants the motion for the reasons stated herein.

## I. FACTUAL AND PROCEDURAL HISTORY

Petitioner filed for a writ of habeas corpus under 28 U.S.C. § 2241 on October 3, 2007. Dkt. 1. Petitioner requests to be released from all restraints imposed by his pending court martial charges, the court martial proceeding originally set to begin on October 9, 2007, on the basis that the proceeding violates the Double Jeopardy Clause of the Fifth Amendment. *Id.* On October 3, 2007, Petitioner also filed his Emergency Motion for a Stay of Court Martial Proceedings. Dkt. 2. After hearing oral argument from Petitioner and Respondents on October 4, 2007 and receiving additional briefing on the issue of jurisdiction, this Court entered an order temporarily staying Petitioner's court martial in order to allow the parties to brief the Motion for Stay. Dkt. 9. Once Petitioner's motion had been fully briefed, the Court extended the preliminary stay until November 9, 2007 in order to allow sufficient time to weigh the significant legal issues raised by the motion and to review the portions of the underlying record submitted by the parties. Dkt. 17.

Petitioner was charged with violating Articles 87 and 133 of the Uniform Code of Military Justice for allegedly refusing to deploy to Iraq on June 22, 2006 and making public statements, between May and August of 2006, expressing his views about the illegality of the war in Iraq. Dkt. 13 at 50. Petitioner wanted to present a defense to the charge of missing movement that concerned his intent:

[T]he question here is, whether or not that was his intent—his specific intent, because it's not just the general intent. It's a specific intent offense. That's what the Manual says. In this case, we will argue, as we've argued before, that his specific intent was to fail to participate in something, which he believed

was unlawful and that therefore, would involve him [in] the commission of war crimes. And that is the intent element that exists here.

Dkt. 12 at 4. Petitioner argued that each soldier's subjective beliefs would determine whether that soldier should follow the order to deploy to Iraq.

That doesn't mean that's [sic] people who don't realize, or don't know what they are doing, have an obligation to refuse to go. But certainly, if one person is conscious, and knows, and full well understands the implications of what he or she is being ordered to do, and reaches the conclusion that that is unlawful, then that person is without an excuse or justification if he or she does it anyway.

Id. at 6. Before the court martial began, "the military judge ruled that, as a matter of law, the order to deploy was lawful, and that Petitioner was not allowed to present evidence on the legality of the war in Iraq or his motive for missing movement." Dkt. 11 at 4; Dkt. 12 at 32. The court martial was held on February 5–7, 2007. Dkt. 12 at 6. During the proceeding, Petitioner entered a plea of not guilty to all the charges and specifications. Id. at 7.

Petitioner and the Government entered into a pretrial agreement wherein the Government agreed to dismiss "Specifications 2 and 3 of Charge II without prejudice to ripen into prejudice upon completion of trial proceedings" in exchange for Petitioner entering into a Stipulation of Fact. Dkt. 14 at 9. The pretrial agreement allowed the nullification of the agreement upon the occurrence of three enumerated events, the third being "the refusal of the military judge to accept the Stipulation of Fact." Id. at 10. Completion of the trial proceedings was explained as either Petitioner being found not guilty or the imposition or announcement of sentence. This definition was accepted by Petitioner. Dkt. 12 at 24.

The Stipulation of Fact admitted certain enumerated facts as true and contained reproduced written versions of the public statements Petitioner made expressing his beliefs about the illegality of the war. Dkt. 14 at 11–22. In the stipulation, Petitioner admitted as fact that "At approximately 1000 hours on 22 June 2006, 1L T Watada intentionally missed the movement of his flight to Iraq." Id. at 17. It further stated that "1 LT Watada intentionally did not board the aircraft and as a result, missed the movement of Flight Number BMYA91111173." Id. The stipulation also stated, "With this stipulation, however, the defense does not waive any future claim with regard to the motions and objections previously litigated." Id.

Before accepting the Stipulation of Fact, the military judge conducted an inquiry, asking Petitioner questions in order to discern his understanding. Dkt. 12 at 8. During this inquiry, the military judge stated as follows:

Lieutenant Watada, the government has the burden of proving beyond a reasonable doubt every element of the offenses to which you've been charged. By stipulating to the material elements of one of the offenses, as you are doing here, you alleviate that burden; that means, based upon the stipulation alone and without receiving any other evidence the court can find you guilty of the offenses to which the stipulation relates.

Do you understand?

Id. at 9. Petitioner responded that he did understand. Id. Petitioner, his counsel, and counsel for the Government agreed to the use of the stipulation. Id. at 9–10. The military judge then inquired into the factual basis for the Stipulation of Fact. With regard to Petitioner's intent to miss a movement, the military judge specifically asked, "What was your intent regarding

the deployment of that aircraft?" *Id.* at 17. Petitioner responded as follows:

Sir, my intent, as I stated in public statements and as I stated to my chain of command numerous times, was that the order to deploy to Iraq to support combat operations in OIF was to me, as I believed in the facts and evidence that I saw, was an illegal order. And that the war itself was illegal, and any participation of mine would be contrary to my oath, and therefore I would have no other choice but to refuse. So my intent was to refuse the order, sir.

*Id.* The military judge replied: "Okay. Did you intend not to get on that aircraft?" *Id.* Petitioner responded: "Yes, sir." *Id.* After some further questioning, the military judge asked if any further inquiry into the factual basis for the Stipulation of Fact was required. *Id.* at 22. The parties answered that the inquiry was sufficient. *Id.* After a discussion of the pretrial agreement, the military judge accepted the stipulation and entered it into evidence. *Id.* at 26.

The court martial then continued forward and preliminary instructions were given, voir dire occurred, and a panel (the military equivalent of a jury), was empaneled. *Id.* The Government proceeded with its case, presented evidence, the Stipulation of Fact was published and read to the panel. The panel then watched two videos attached to the Stipulation of Fact that showed Petitioner making the public statements reproduced in the stipulation. Dkt. 11 at 4–5. The military judge also instructed the panel members that, as a matter of law, "the order to deploy, if given, is lawful." *Id.* at 5. The Government then closed its case at 1546 on February 6, 2007. Dkt. 12 at 47.

The military court reconvened the next day. *Id.* Before counsel for Petitioner presented any evidence, Petitioner submitted a proposed jury instruction that contained the following language: "The evidence has raised the issue of mistake on the part of the accused concerning his belief that he had a legal and moral obligation to refuse to participate in the war in Iraq relating to the offenses of missing movement." Dkt. 11 at 5. The military judge expressed concern that this proposed instruction conflicted with the Stipulation of Fact and decided to reopen the inquiry into his acceptance of the stipulation. Dkt. 12 at 47. The military judge began by inquiring into the basis for the defense of mistake of fact and what element it went to. *Id.* at 48. Petitioner's counsel answered as follows:

It goes to the intent element; purely to the intent element. With respect to the missing movement charge, it has always been Lieutenant Watada's position that he intended not merely to miss movement, but to avoid participating in a war that he considered to be illegal, and that the orders to compel him to go to Iraq, in essence, were compelling him to put himself in a position where he would be supporting and engaging in war crimes.

So his specific intent, which is required by the offense, was not the mere intent to miss a movement. His intent, his state of mind, was of a different character, altogether. And, we have argued that repeatedly. We have also, as you know, in the stipulation, if you look at the last paragraph—sorry, the last sentence of the first paragraph, it says it there, and you approved this language, "With this stipulation; however, the defense does not waive any future claim with regard to the motions and objections previously litigated."

*Id.* Petitioner's counsel further stated, "We did not plead guilty because there is a dispute in this case over the intent element, and that is what the instruction goes

to." Dkt. 16–2 at 1. Upon further discussion, Petitioner's counsel contended that the instruction did not conflict in any way with the stipulation. *Id.* The Government agreed:

> Government tends to agree that there is no contradiction in the stipulation. We just absolutely disagree that this should even be an issue at this point. The court has previously ruled that the order [to deploy] was lawful, and the accused clearly intended to miss movement.

*Id.* The military judge still believed that there was a problem with Petitioner's understanding "and whether he believes that there is a defense because he has stipulated to all of the elements." *Id.* at 2. Petitioner's counsel answered:

> He does believe there is a defense. We tried to raise that defense by motions, and you rejected those motions. And my assumption is, consistent with your rejection of those motions, that you will reject this instruction. But we are offering it consistent with the prior motions we raised, because his state of mind was of a different nature than what the government contends is adequate for the purposes of this charge. And that's the only disagreement we have.
>
> There is no disagreement with any of the language contained in Paragraph 4. We agreed to stipulate to that so that it would make the government's case easier in terms of not having to bring people and introduce documents, as they've done at prior proceedings to show that he didn't get on the plane; that he received the order, and that he knew what he was doing when he didn't get on the plane.

*Id.* The military judge then informed the parties that he was entertaining the idea of throwing out the stipulation and declaring a mistrial. Counsel for Petitioner then warned the military judge as follows:

> Colonel, let me just say, I would assume that if that were to happen, you would allow us sufficient time to appeal from that order because jeopardy has attached, and it may very well be that the retrial is impermissible. If that's the case, then we need to discuss this and make some decisions.

*Id.* at 4.

At 1057 on February 7, 2007, the military judge then allowed a recess for Petitioner to discuss whether he would answer further questions inquiring into his understanding of the stipulation. Dkt. 12 at 49. The military court reconvened at 1224 on the same day and the military judge began to question Petitioner. *Id.* The military judge again asked Petitioner, "What does it mean that you intentionally did not aboard the aircraft?" *Id.* at 50. Petitioner responded:

> Your Honor, in that sentence, Paragraph 4, what I was saying is that I intentionally missed the movement because I believed my participation in the war in Iraq would contribute to war crimes, and it would be contributing to what I believed an illegal war.

*Id.* The military judge further inquired, "So when you talk about you intentionally missed this movement, did you believe you had a duty to make that movement?" *Id.* at 51. Petitioner responded, "Your Honor, no. I did not feel I had that duty, because I was being ordered to do something I felt was illegal." *Id.* Petitioner continued as follows:

> Your Honor, I have always believed, especially at this point in time, that I had a legal and moral defense. I realize that the government has made arguments contrary to that, and you've also made rulings contrary to that. It still

does not negate my belief that I still have a defense.

*Id.* The military judge then read his statements from the initial inquiry into the stipulation, expressing his belief that Petitioner had stipulated to every element of the charge of missing movement that was required to find him guilty. *Id.* He asked Petitioner, "What does that mean to you because you stipulated to every element of the offense of missing movement by design?" *Id.* Petitioner answered, "Sir, yes, I do understand that I stipulated, and I believe—I understand the arguments that the prosecution was making. But I also understand that there is additional evidence that could go to my defense." *Id.*

After the military judge had this exchange with Petitioner, he then asked counsel for the Government and Petitioner whether they believed the stipulation was a "confessional stipulation" under Rule for Court Martial 811. *Id.* The Government responded:

> We did, Your Honor. Further, we would just like to point out that he has— the accused has admitted to every element of the offense. His subjective beliefs in the legality of the order are irrelevant and his motives for missing the movement are absolutely irrelevant, as provided in your previous ruling, and he would have—so, at this point, I guess I'm just at a loss.

*Id.* at 53. Counsel for Petitioner answered as follows:

> As far as it goes, it is a stipulation of fact, which was intended to relieve the government of proving certain facts; however, it has always been our position that Lieutenant Watada has a defense based upon the motions that we raised earlier, which you have precluded us from raising at trial, and we are not altering our position in that respect, nor did we alter it in this stipulation, as I

pointed out to you in the preparatory paragraph in the last sentence which says that this stipulation is being made subject to prior arguments and without waiving those arguments.

* * *

> I believe that you and the government could interpret it as [a confessional stipulation] ... and that the government could argue, based upon this stipulation, that they don't have to prove anything further based upon their theory of the case. Our theory of the case is somewhat different.

*Id.* The military judge continued to press the issue and again raised the question to the Government asking whether they believed there was any material fact not admitted by the stipulation. *Id.* at 54. The Government responded:

> Your Honor, we believe that Paragraph 4 provides evidence of every material fact in Article 87. In other words, we have evidence to prove every element in Article 87. We understand the defense's position that they believe they have defense. Obviously, we disagree.

*Id.* The military judge then expressed his belief that there was a problem with the parties holding differing viewpoints on whether Petitioner had a defense to the charge of missing movement and whether the Stipulation of Fact was confessional or not. *Id.* He asked the parties whether they believed there was a problem because he felt these issues indicated that there had not been "a meeting of the minds." *Id.* The Government stated:

> In terms of the four corners of this agreement, I think there is a meeting of the minds. I think both parties agreed to the contents of Paragraph 4 of the Stipulation of Fact. That goes to the "what" of the offense.

The defense would want to raise the issue of "why" as a defense, and we would object to that. But in terms of what's contained in [the] agreement, I think—obviously, let the defense chime in, but [we] believe there was a meeting of the minds.

*Id.* at 54–55. Then the following exchange took place:

[MILITARY JUDGE]: Did he not—has he not set up matters inconsistent with—he believes he has a defense to what he has stipulated to in a confessional stipulation. Whether it's a valid defense or not, government, isn't the point.

[GOVERNMENT]: Your Honor, I don't see it. I mean, the subjective beliefs of the accused and that he has a defense are not relevant.

[MILITARY JUDGE]: Counsel, it's just like if he pled not guilty, but as to this offense, you have to treat it essentially like a guilty plea, because he admits to all the facts surrounding the offense. That's what *Bertelson* is about. That's what all that case law is about. It's so you don't shortcut the system.

[GOVERNMENT]: Your Honor, I don't see how this is short cutting the system. In another case, the accused can plead to the elements of the crime and then still get up and say, "But I have a reason." He has pled not guilty to the offense.

[MILITARY JUDGE]: Thank you. Defense, do you wish to be heard?

[COUNSEL FOR PETITIONER]: Just briefly. This is a stipulation; it's not a guilty plea. It's a stipulation of facts. That is to be judged differently. The impact or the effect of the stipulation, the parties can disagree about. And we apparently do disagree, but Lieutenant Watada's pleading not guilty. He's always made that clear. And yet, he is willing to plead to the facts which he understood

could be sufficient on which to find him guilty, as you instructed. He knows that based upon the legal rulings and determinations the court makes. But he still maintains notwithstanding those rulings that he is entitled to plead not guilty for the reasons that he has stated to you.

[MILITARY JUDGE]: What does "uncontradicted" mean? What uncontradicted material facts? He's essentially pled guilty to missing movement by design by admitting to every fact necessary.

[COUNSEL FOR PETITIONER]: That's a legal conclusion, which you're drawing, and which you may be entitled to draw, subject to whatever legal rulings you make. It's not a legal ruling which we agree with and it's not a conclusion that we will draw no matter how much you argue to us about it we will not draw that conclusion, and we will also appeal it, if necessary.

[MILITARY JUDGE]: I'm just trying to understand how his subjective belief fits into this because he's raising that he doesn't believe he intentionally missed the movement.

[COUNSEL FOR PETITIONER]: What he's said to you in his answers to your questions is that the act of not getting on the plane was not a mistake. He did that deliberately. But he did it for a specific reason out of a specific intent with which the government does not agree and which the government deems to be irrelevant, and which you have ruled is not relevant. That's all he's saying. And he's made that argument from the beginning, long before he actually failed to get on the plane. That's simply our position.

[MILITARY JUDGE]: I understand your position, but I just go back to when I advised the accused—and he agreed. Stipulated to the material elements; he

1144

stipulated to the material elements of this offense. And now you're saying that he's not stipulated to the material elements of the offense.

[COUNSEL FOR PETITIONER]: Well, he's saying what he's saying, which is essentially that he's stipulating as far as he's able and willing to go with the understanding that the facts to which he's stipulating might be sufficient to dispose of that charge against him based upon the rulings of the court. And that's as far as we can go. And he understands that.

*Id.* at 55–57.

The Government then requested a fifteen-minute recess, and the military judge asked whether the Government understood his problem. *Id.* at 57. The Government retorted, "Frankly your Honor, no." *Id.* The Government expressed its belief that the military judge had already disposed of these issues through his ruling on pretrial motions. *Id.* The military judge reiterated his concerns:

It's the intent element and it's the—government, it's 1245. I'll give you until 1300. You said you needed 15 minutes; I'll give you 15 minutes. I don't see where there is a meeting of the minds here. I see that there is an inconsistency in the stipulation of fact. I don't know how I can continue to accept Prosecution Exhibit 4, as Prosecution Exhibit 4, as we stand here now.

At this point I'm thinking we're going to have to reset a new trial date and those other charges will come back. Why don't we take 15 minutes. We'll let you come back, and if you've got something more you want to present I'll be glad to listen to it, but right now that's my thought. And, when we come back, I'll make my ruling.

*Id.* at 58. After a short recess, the proceedings resumed. The military judge

again asked whether the Stipulation of Fact was a "confessional stipulation." *Id.* at 59. Both parties agreed, at this point in the proceedings, that the Stipulation of Fact was not a "confessional stipulation." *Id.* The Government stated further:

The government's understanding is that it is a stipulation of fact; the accused has not pleaded guilty to the offense and if he [has] evidence to present that would be able to prove that he is not guilty of the offense, then the court should hear that evidence.

*Id.* at 60. The military judge persisted in his belief that there was a problem with the stipulation and the Government responded:

Your Honor, I don't know what else to say other than what's already been said. The parties agree that the contents of the stipulation—the parties agree that it is a stipulation of fact.

*Id.* In response, the military judge stated:

That's not the issue. At this point I'm reconsidering Prosecution Exhibit 4 and rejecting the stipulation of fact. It's now Prosecution Exhibit 4 for identification, as the government has closed its case. Government, do you wish to reopen your case, or do you wish, as we now have a material breach of the pretrial agreement, do you wish to request a mistrial because at this point we don't have evidence on every element?

*Id.*

The court then took a forty-minute recess. *Id.* at 61. Upon return, counsel for Petitioner restated that Petitioner did not want to withdraw from the stipulation and the following exchange took place:

[MILITARY JUDGE]: Government, what's your druthers? At this point, I certainly entertain a motion for a mistrial and I'll set a new trial date. At this point, I believe there is a breach of the pretrial

agreement, which would allow the government to resurrect the additional charges that were dismissed because we have not reach[ed] the determination point, as required, for a dismissal with prejudice. I believe the government was, at 802, asking about the ... [intent] element that's in there. But if you review the entirety of the stipulation of fact, that I think even a casual reading of the stipulation—every statement in there goes to the, "I do not intend to deploy." I don't know how we get around that. What we're left with is I can instruct the members, if the government wishes to go forward. I know the government does not have all of their witnesses that they would have called for the other offenses. So, government, what's your choice?

[GOVERNMENT]: Your Honor, at this point, the government moves for mistrial.

[MILITARY JUDGE]: Defense, do you want to be heard?

[COUNSEL FOR PETITIONER]: Yes. We would oppose the motion.

[MILITARY JUDGE]: Counsel, I have the week of 19 March available.

[COUNSEL FOR PETITIONER]: Can we first determine, are you declaring a mistrial?

[MILITARY JUDGE]: I'm going to declare a mistrial.

*Id.* at 62–63. The court martial was then adjourned and an Article 39(a) session was immediately called to order wherein the military judge formally granted the motion for mistrial and set a new trial date for March 19, 2007. *Id.* at 64.

Preparations for starting a new trial then began and the charges were re-preferred and referred for trial on February 23, 2007. Dkt. 11 at 5. Petitioner filed a Petition for Extraordinary Relief in the Nature of a Writ of Prohibition and an Application for Stay of Proceedings with the Army Court of Criminal Appeals. Dkt. 14 at 28. Petitioner based the application on his belief that a second prosecution of the same charges would violate his Fifth Amendment right to be free from double jeopardy. *Id.* On May 18, 2007, the Army Court of Criminal Appeals issued an order granting the petition in part by instituting a stay of the second court martial and requiring the Government to respond to the petition and show cause why the petition should not be granted. *Id.* at 25. On June 29, 2007, the Army Court of Criminal Appeals denied the petition on the grounds that Petitioner had not first moved to dismiss in the military trial court. *Id.* at 27.

Petitioner next filed a motion to dismiss on double jeopardy grounds in the military trial court on July 2, 2007. Dkt. 13 at 67. The Government filed an opposition brief on July 5, 2007, and both parties presented evidence and argued their positions to the military court on July 6, 2007. Dkt. 13. The military judge issued an order denying the motion to dismiss, together with findings of fact and conclusions of law, on July 11, 2007. Dkt. 14–2 at 107–119.

On July 27, 2007, Petitioner again sought relief from the Army Court of Criminal Appeals by way of a Renewed Petition For Extraordinary Relief and once more made an application for a stay of the court martial proceedings. Dkt. 14 at 62. The Government was ordered to provide an authenticated copy of the post mistrial proceedings. Dkt. 11 at 6. The Government was also allowed to file a brief in opposition. Dkt. 14–2 at 96. On August 27, 2007, Petitioner filed a motion to expedite the ruling on his application for a stay. Dkt. 11 at 6. On August 28, 2007, the Army Court of Criminal Appeals denied Petitioner's application and denied the petition on the basis that the "military

judge did not abuse his discretion by granting the mistrial." Dkt. 7 at 6. The order provided a brief, one-paragraph explanation of the reasoning for the denial and made no new conclusions or findings. *Id.*

Finally, on September 17, 2007, Petitioner sought relief from the United States Court of Appeals for the Armed Forces by way of a Petition for a Writ of Prohibition and an Application for Immediate Stay of Trial Proceedings. Dkt. 11 at 6. On October 5, 2007, in a one-page order, the United States Court of Appeals for the Armed Forces denied the petition and application for stay but made no findings of fact or conclusions of law. Dkt. 7 at 4.

## II. JURISDICTION

Petitioner has filed his petition for a writ of habeas corpus under 28 U.S.C. § 2241, which provides in part as follows:

(a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any *circuit judge within their respective jurisdictions.* The order of a circuit judge shall be entered in the records of the district court of the district wherein the restraint complained of is had.

\* \* \*

(c) The writ of habeas corpus shall not extend to a prisoner unless—

(1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

(2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

(3) He is in custody in violation of the Constitution or laws or treaties of the United States; or

(4) He, being a citizen of a foreign state and domiciled therein is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations; or

(5) It is necessary to bring him into court to testify or for trial.

28 U.S.C. § 2241. Section 2241 is the proper avenue for petitioners who are not in custody pursuant to a judgment or sentence. *See Stow v. Murashige,* 389 F.3d 880, 885 (9th Cir.2004). Petitioners proceeding under 28 U.S.C. § 2241 are not subject to the one-year statute of limitations, deferential review of state court decisions, limitation on successive petitions, or state court exhaustion requirements of the 1996 Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (codified as amended at, in relevant part, 28 U.S.C. § 2254(d)). *White v. Lambert,* 370 F.3d 1002, 1009 (9th Cir.2004).

■ "[T]he writ of habeas corpus occupies a position unique in our jurisprudence, the consequence of its historical importance as the ultimate safeguard against unjustifiable deprivations of liberty." *Schlesinger v. Councilman,* 420 U.S. 738, 752, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975) The purpose of the writ of habeas corpus is to provide a remedy for severe restraints on liberty, and for this reason, a person requesting the writ is required to be in "custody." *Hensley v. Municipal Court,* 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973); *Peyton v. Rowe,* 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968); *Jones v. Cunningham,* 371 U.S.

236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963). Custody can be shown where a person is subject to restraints on liberty "not shared by the public generally." *Jones*, 371 U.S. at 240, 83 S.Ct. 373. Petitions for writs of habeas corpus are available to members of the armed services who are not seeking a discharge from military service as part of their claims. *Glazier v. Hackel*, 440 F.2d 592 (9th Cir.1971); *Bratcher v. McNamara*, 448 F.2d 222 (9th Cir.1971). Petitioner alleges that the restraint on liberty he is being subjected to is a court martial proceeding that would violate his Fifth Amendment right to be free from double jeopardy. Dkt. 1 at 9. The Supreme Court of the United States has held that being required to appear for trial is sufficient to show custody over an individual for habeas purposes. *Justices of Boston Municipal Court v. Lydon*, 466 U.S. 294, 300–301, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984).

■ As a general rule, where members of the armed forces file habeas petitions seeking relief from the military's wrongful restraint of liberty, federal civilian courts should not entertain such petitions until all available remedies within the military court system have been exhausted. *Councilman*, 420 U.S. at 758, 95 S.Ct. 1300; *Noyd v. Bond*, 395 U.S. 683, 693, 89 S.Ct. 1876, 23 L.Ed.2d 631 (1969); *Gusik v. Schilder*, 340 U.S. 128, 71 S.Ct. 149, 95 L.Ed. 146 (1950). Petitioner's habeas petition asks this Court to determine issues that have also been placed before the military trial court, the Army Court of Criminal Appeals, and the United States Court of Appeals for the Armed Forces. All of these courts have denied Petitioner's claims. Therefore, Petitioner has exhausted his available remedies in the military court system. Petitioner has satisfied the custody and exhaustion requirements necessary for bringing this petition and the

Court may properly exert jurisdiction over Petitioner's claims.

## III. THE REMEDY SOUGHT BY PETITIONER, WHILE RARE, IS APPROPRIATE

Petitioner has requested that this Court stay his upcoming court martial until a final decision on his habeas petition has been rendered. Dkt. 2 at 23. Respondents urge that the relief requested is in effect asking this Court to enjoin the military from proceeding with Petitioner's court martial and therefore is more properly a request for a preliminary injunction. Dkt. 11 at 14. Respondents contend that the Court is precluded from instituting this remedy by *Schlesinger v. Councilman* and the Court should therefore abstain from exerting jurisdiction over Petitioner's habeas claim until after his second court martial proceeding is completed and all avenues of military appellate review have been undertaken. Dkt. 11 at 13.

In the present matter, the nature of Petitioner's habeas claim militates against abstention. Petitioner sat for a court martial which ended in a mistrial declared after the close of the Government's case and before the defense was allowed to present evidence. Petitioner then exhausted his military court administrative remedies with respect to his claim that double jeopardy would bar a subsequent court martial. "[T]he very nature of a double jeopardy claim is such that it is collateral to, and separable from the principal issue at the accused's impending criminal trial, i.e., whether or not the accused is guilty of the offense charged." *Abney v. U.S.*, 431 U.S. 651, 659, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). Under these circumstances, where Petitioner has exhausted his military court remedies on the issue of double jeopardy, allowing the second court martial to go forward would not

aid the military in developing the facts, applying the law, or correcting their own errors. The military courts have already had their opportunity to develop the facts, apply the law, and to correct their own errors, and the pending court martial will not address any of the issues raised by this petition.

 *Parisi v. Davidson* provides one example of the circumstances under which it is appropriate for an Article III court to intervene in a pending court martial. 405 U.S. 34, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972). [T]he *Parisi* exception—allowing a service member to pursue a collateral attack challenging a military action before the completion of court-martial proceedings—is limited to situations in which: (1) a service member subject to military authority asserts a legal right against the military that has been clearly established by statute, regulation, or other applicable law; (2) administrative procedures are in place to enforce that right; and (3) the service member has fully exhausted these procedures and has been denied relief attendant to the right asserted.

*New v. Cohen,* 129 F.3d 639, 644. Here, Petitioner has a pending court martial proceeding scheduled which he claims would subject him to being put twice in jeopardy for the same offense. The legal right to be free from double jeopardy has been clearly established by the Fifth Amendment of the United States Constitution as well as the Uniform Code of Military Justice Article 44 and 10 U.S.C. § 844(a). The administrative procedures in place to enforce that right are carried out by the military trial court, the Army Court of Criminal Appeals, and the United States Court of Appeals for the Armed Forces. Petitioner has exhausted these procedures and has been denied relief attendant to his asserted right to be free from double jeop-

ardy. Under these circumstances Petitioner's claims fall squarely within the exception enunciated by the Supreme Court in *Parisi* and this Court should not abstain from hearing this petition until after the second court martial has been concluded.

 However, having decided that this Court is not required to abstain from exerting jurisdiction over these claims until after the second court martial is completed, it still must be determined whether this Court may impose a preliminary injunction over the pending court martial until after the resolution of this matter. The Supreme Court in *Councilman* provided insight into this issue by holding: "When a serviceman charged with crimes by military authorities can show no harm other than that attendant to resolution of his case in the military court system, the federal district courts must refrain from intervention, by way of injunction or otherwise." 420 U.S. at 758, 95 S.Ct. 1300. Equitable intervention is precluded "unless the harm sought to be averted is 'both great and immediate,' of a kind that 'cannot be eliminated by ... defense against a single criminal prosecution.' " *Id.* at 756, 95 S.Ct. 1300. As stated above, a double jeopardy claim is collateral to and separable from underlying criminal charges. *Abney,* 431 U.S. at 659, 97 S.Ct. 2034. "[A] defendant raising an *Abney*-type claim—asserting a valid, constitutional 'right not to be tried'—would be irreparably harmed if the trial court continued to proceed to trial prior to the disposition of the appeal." *U.S. v. Claiborne,* 727 F.2d 842, 850 (9th Cir.1984). "Consequently, if a criminal defendant is to avoid exposure to double jeopardy and thereby enjoy the full protection of the Clause, his double jeopardy challenge to the indictment must be reviewable *before* that subsequent exposure occurs." *Abney,* 431 U.S. at 662, 97 S.Ct. 2034 (emphasis added). Here the harm is

both immediate (if a preliminary injunction is not issued, the very harm Petitioner is seeking to avoid will occur) and great (as evidenced by its embodiment in the Fifth Amendment, the Uniform Code of Military Justice Article 44 and 10 U.S.C. § 844(a)). Therefore, Petitioner has shown greater harm "than that attendant to resolution of his case in the military court system" and *Councilman* should not bar this Court from issuing a preliminary injunction over Petitioner's second court martial proceeding if Petitioner can meet the standards for such relief. 420 U.S. at 758, 95 S.Ct. 1300.

## IV. PROPER SCOPE OF REVIEW

While 28 U.S.C. § 2241 does not distinguish between persons confined by military and civil courts, the military context is markedly different. *Burns v. Wilson,* 346 U.S. 137, 139, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953); *Philips v. Perry,* 106 F.3d 1420, 1431 (9th Cir.1997) ("Before a military tribunal, a defendant's constitutional rights are not the same as before a civilian court.... Habeas corpus does not exist in its full robustness."). The proper scope of review in military habeas petitions is somewhat unclear.

■ In *Burns,* the Supreme Court provided for only a limited scope of review. Under the rule of *Burns,* civil courts should not "re-examine and reweigh each item of evidence of the occurrence of events which tend to prove or disprove one of the allegations in the applications for habeas corpus." *Burns,* 346 U.S. at 144, 73 S.Ct. 1045. Rather, the Supreme Court held, the role of the civil court is to determine whether the "military review was legally inadequate to resolve the [habeas] claims." *Id.* at 146, 73 S.Ct. 1045. In other words, when reviewing a habeas corpus petition from a person in custody by order of a military court, *Burns* limits the role of Article III courts to "determin[ing] whether the military have given fair consideration to" each of the petitioner's allegations. *Id.* at 144, 73 S.Ct. 1045.

Generally speaking, "[t]he federal courts' interpretation ... of the language in *Burns* has been anything but clear." *Dodson v. Zelez,* 917 F.2d 1250, 1252 (10th Cir.1990). For example, in *Sunday v. Madigan,* 301 F.2d 871, 873 (9th Cir.1962), the Ninth Circuit applied the rule in *Burns. See also Daigle v. Warner,* 490 F.2d 358, 366 (9th Cir.1973) (noting that proceedings on remand would be "subject to limited judicial review in habeas proceedings under the 'fully and fairly' test"). The Ninth Circuit has also shown reluctance to fully embrace the rule of *Burns.* The Ninth Circuit in *Broussard v. Patton,* 466 F.2d 816, 820 (9th Cir.1972), deferred to the judgment of the military court in light of the Court of Military Appeals having fully and fairly considered the issue, but also noted that the issue was "uniquely military," and the factual distinction was narrow. In *Hatheway,* the Ninth Circuit applied the *Burns* rule to errors concerning only discovery but held that "[t]he *Burns* plurality does not preclude civil court consideration of the constitutional [equal protection, due process, and First Amendment] defects alleged here." *Hatheway v. Secretary of Army,* 641 F.2d 1376, 1380–81 (9th Cir.1981), *abbrogated on other grounds by High Tech Gays v. Defense Indus. Sec. Clearance Office,* 895 F.2d 563 (9th Cir.1990).

■ The Fifth Circuit, noting that the federal courts have differed in their application of *Burns,* has summarized the scope of review as follows:

Military court-martial convictions are subject to collateral review by federal civil courts on petitions for writs of habeas corpus where it is asserted that the court-martial acted without jurisdiction,

or that substantial constitutional rights have been violated, or that exceptional circumstances have been presented which are so fundamentally defective as to result in a miscarriage of justice. Consideration by the military of such issues will not preclude judicial review for the military must accord to its personnel the protections of basic constitutional rights essential to a fair trial and the guarantee of due process of law. The scope of review for violations of constitutional rights, however, is more narrow than in civil cases. Thus federal courts should differentiate between questions of fact and law and review only questions of law which present substantial constitutional issues. Accordingly, they may not retry the facts or reevaluate the evidence, their function in this regard being limited to determining whether the military has fully and fairly considered contested factual issues. Moreover, military law is a jurisprudence which exists separate and apart from the law governing civilian society so that what is permissible within the military may be constitutionally impermissible outside it. Therefore, when the military courts have determined that factors peculiar to the military require a different application of constitutional standards, federal courts are reluctant to set aside such decisions.

*Calley v. Callaway,* 519 F.2d 184, 203 (5th Cir.1975). There are four inquiries under the Fifth Circuit's approach: (1) the alleged error in the court martial be "one of constitutional significance or so fundamental as to have resulted in a miscarriage of justice"; (2) the alleged error must be a question of law and "not intertwined with disputed facts previously determined by the military"; (3) "whether factors peculiar to the military or important military considerations require a different constitutional standard"; and (4) whether the military courts adequately considered the issues raised in the habeas corpus proceeding and applied the proper legal standard. *Calley,* 519 F.2d at 201–03. The Tenth Circuit has also utilized this approach. *See Dodson,* 917 F.2d at 1252. The Fifth Circuit's approach provides a useful framework for determining the proper scope of review of Petitioner's habeas petition.

First, the alleged error, being put to trial twice for the same offense, does present a substantial constitutional question. The prohibition against double jeopardy is embodied in the Fifth Amendment to the United States Constitution and in the Uniform Code of Military Justice. U.S. Const. amend. V ("nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb"); 10 U.S.C. § 844(a) ("No person may, without his consent, be tried a second time for the same offense.").

Second, Petitioner alleges an error of law that is independent from facts found by the military trial court. The parties do not allege any factual disputes, and whether a defendant's double jeopardy rights have been violated is a question of law. *U.S. v. McClain,* 133 F.3d 1191, 1193 (9th Cir.1998). The legal nature of Petitioner's claims weighs in favor of this Court's review.

Third, Petitioner's habeas petition does not raise matters peculiar to the military, and Respondents do not contend that the military context requires a different standard for analyzing double jeopardy claims. Respondents raise concerns inherent to an Article III court's review or critique of military court actions but do not contend or demonstrate that matters raised in the instant petition are better left to the knowledge and experience of the military court system.

Finally, the question of whether the military court system adequately considered Petitioner's double jeopardy argument and applied the proper legal standard is not entirely clear. The orders of the United States Army Court of Criminal Appeals and the United States Court of Appeals for the Armed Forces are brief and not accompanied by opinions. While this Court will not presume that consideration of Petitioner's claims was anything less than adequate merely because those courts did not provide detailed analyses, this Court cannot conclude that Petitioner's claims have received full and fair consideration. *See* Dkt. 7 at 3–6; *see also Hatheway,* 641 F.2d at 1380 n. 4. In addition, it is unclear whether the military courts applied the proper standard of review. While the United States Court of Appeals for the Armed Forces employed the abuse of discretion standard, the order of the United States Army Court of Criminal Appeals does not disclose the standard applied. Dkt. 7 at 3, 6.

Having determined that the petition raises a substantial constitutional question, that the alleged error is independent from the military trial court's determination of the facts, that the petition does not raise matters unique to the military, and that it is unclear whether the military courts gave Petitioner's double jeopardy claim full and fair consideration under the proper legal standard, the Court concludes that review of the military trial court's denial of the motion to dismiss the court martial is subject to collateral attack under 28 U.S.C. § 2241.

## V. PROPER STANDARD OF REVIEW

When evaluating Petitioner's request for injunctive relief, the Court is mindful of not only the relevant scope of review, addressed *supra*, but also of the proper standard of review. The parties disagree as to the standard of review applicable to habeas corpus petitions under 28 U.S.C. § 2241. Respondent contends that this Court should review the military court's declaration of a mistrial for abuse of discretion, citing cases that involved direct appeals rather than collateral attacks. *See* Dkt. 11 at 18 ("The appropriate standard of review of a decision to declare a mistrial is an abuse of discretion."); *U.S. v. Vincent,* 758 F.2d 379 (9th Cir.1985); *U.S. v. Dancy,* 38 M.J. 1 (C.M.A.1993). Petitioner contends that this Court should employ de novo review. *See* Dkt. 15 at 10 ("It is well-established that where, as here, a mistrial is declared over the defendant's objection, federal courts 'review a district court's denial of a motion to dismiss on double jeopardy grounds de novo.' "); *U.S. v. Sammaripa,* 55 F.3d 433 (9th Cir.1995) (direct appeal); *U.S. v. McKoy,* 78 F.3d 446 (9th Cir.1996) (same); *Weston v. Kernan,* 50 F.3d 633 (9th Cir.1995) (petition under 28 U.S.C. § 2254); *Stow,* 389 F.3d 880 (petition under 28 U.S.C. § 2241). Because AEDPA does not apply to petitions under 28 U.S.C. § 2241, pre-AEDPA standards govern this Court's review: determinations of law are reviewed de novo and findings of fact are presumed to be correct. *Hoyle v. Ada County,* 501 F.3d 1053, 1059 (9th Cir.2007). Even under the more deferential standard urged by Respondent, however, the Court concludes that the requirements for injunctive relief are satisfied, as explained below.

## VI. THIS COURT SHOULD ISSUE A PRELIMINARY INJUNCTION OVER PETITIONER'S PENDING COURT MARTIAL

■ Petitioner's request is presented to the Court as a motion to stay. Dkt. 2. Respondents urge the Court to construe the request as a motion for injunctive relief. Dkt. 11 at 14. Petitioner does not

object to this construction of his request, and the Court deems principles governing injunctive relief appropriate to analyze Petitioner's request. See Dkt. 15.

The basic function of injunctive relief is to preserve the status quo pending a determination of the action on the merits. *Los Angeles Memorial Coliseum Com'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir.1980). Under the traditional standard, in order for Petitioner to obtain injunctive relief, the Court must find that: "(1) the moving party will suffer irreparable injury if the relief is denied, (2) the moving party will probably prevail on the merits, (3) the balance of potential harm favors the moving party, and (4) the public interest favors granting relief." *Cassim v. Bowen*, 824 F.2d 791, 795 (9th Cir.1987). The Court finds that a preliminary injunction should issue over Petitioner's pending court martial for the following reasons.

## A. Petitioner Will Suffer Irreparable Injury if Relief is Denied

The Uniform Code of Military Justice Article 44(a) and 10 U.S.C. § 844(a) apply the protections of the Fifth Amendment of the United States Constitution to members of the military. Under the Fifth Amendment a person cannot be tried twice for the same offense. U.S. Const. amend. V. Once a jury, or a panel of members in a military court, is impaneled and sworn, jeopardy attaches. *Crist v. Bretz*, 437 U.S. 28, 35, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978); *U.S. v. Jaramillo*, 745 F.2d 1245, 1247 (9th Cir.1984). One of the protections afforded an individual accused of a crime by the Fifth Amendment is that once jeopardy attaches, the accused has a "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949). A defendant has a strong interest in "being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *U.S. v. Jorn*, 400 U.S. 470, 486, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971).

> Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial.

*Arizona v. Washington*, 434 U.S. 497, 503–505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978).

The Supreme Court has held that the protections afforded by the Double Jeopardy Clause "would be lost if the accused were forced to 'run the gauntlet' a second time before an appeal could be taken; even if the accused is acquitted, or if convicted, has his conviction ultimately reversed on double jeopardy grounds, he still has been forced to endure a trial that the Double Jeopardy Clause was designed to prohibit." *Abney*, 431 U.S. at 662, 97 S.Ct. 2034. The Ninth Circuit left no doubt as to the degree of harm that would be suffered if a defendant asserting a valid double jeopardy claim was subjected to a second trial before his claim was decided; the harm "would be irreparabl[e]." *U.S. v. Claiborne*, 727 F.2d 842, 850 (9th Cir. 1984). Therefore, if Petitioner is able to demonstrate a valid double jeopardy claim, allowing the second court martial to proceed before his habeas petition is decided would subject him to irreparable harm.

## B. Petitioner is Likely to Succeed on the Merits

The critical issue to be determined is whether Petitioner's double jeopardy claim is likely to succeed on the merits.

The determination by the trial court to abort a criminal proceeding where jeopardy has attached is not one to be lightly undertaken, since the interest of the defendant in having his fate determined by the jury first impaneled is itself a weighty one.... Nor will the lack of demonstrable additional prejudice preclude the defendant's invocation of the double jeopardy bar in the absence of some important countervailing interest of proper judicial administration.

*Arizona*, 434 U.S. at 505, 98 S.Ct. 824, *quoting Illinois v. Somerville*, 410 U.S. 458, 471, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). In order to avoid a double jeopardy bar where the defendant has objected to the declaration of a mistrial, the "prosecution must demonstrate 'manifest necessity.' " *Arizona*, 434 U.S. at 505, 98 S.Ct. 824. Manifest necessity requires "a 'high degree' [of necessity] before concluding that a mistrial is appropriate." *Id.* The prosecution's burden "is a heavy one." *Id.* "The power to grant a mistrial should be used with great caution, under urgent circumstances, and for plain and obvious reasons." *U.S. v. Brooks*, 42 M.J. 484, 485 (1995).

A mistrial without defense consent is therefore justified "only in very extraordinary and striking circumstances," where it becomes impossible for the jury to reach an impartial verdict, or there is improper conduct of such a nature that a conviction would likely be reversed on appeal. Even where there are "circumstances which raise serious doubt regarding the fairness of the proceedings, the trial judge must, before granting a mistrial, determine that an alternative measure, less drastic than mistrial, would not alleviate the problem so as to allow the trial to continue to an impartial verdict."

*U.S. v. Ghent*, 21 M.J. 546, 550 (A.F.C.M.R.1985) citations omitted.

[I]f a trial judge acts irrationally, irresponsibly, precipitately or otherwise abuses his discretion, his decision to grant a mistrial cannot be condoned. This is also the case where he has not engaged in sufficient inquiry to decide the issue. Without complete information, a judge cannot "assess all the factors which must be considered in making a necessarily discretionary determination regarding the jury's ability to render an impartial verdict."

*Id.* at 551 (citations omitted). The judge is not required to make affirmative findings of fact to support his declaration of a mistrial. *Arizona*, 434 U.S. at 516–17, 98 S.Ct. 824.

However, the record must support (1) a reasonable conclusion that the events at trial were sufficiently serious to override the interests of the defendant in completing the trial, and (2) a determination that there were no "measures short of mistrial" that "might have sufficed to mitigate or cure any perceived undue trial prejudice."

*Ghent*, 21 M.J. at 551 (citations omitted). For several reasons, explained more fully below, this Court concludes that it is likely that Petitioner will succeed on the merits of his double jeopardy claim because it is likely the military judge abused his discretion in rejecting the stipulation midway through the trial on the same information upon which he accepted it, that there was no manifest necessity for calling a mistrial, and that the record does not reflect that reasonable alternatives to calling a mistrial were explored or entertained.

### 1. The Military Judge Abused his Discretion in Rejecting the Stipulation of Fact

The rejection of the Stipulation of Fact occurred virtually simultaneously with the declaration of mistrial in this matter, with the former facilitating the latter, and the Court must therefore determine whether the military judge abused his discretion in rejecting the stipulation and declaring a mistrial over the defense's objection. The military judge's determination that the stipulation needed to be thrown out and a mistrial declared was based upon his belief that Petitioner's insistence that he had a defense to the charge of missing movement showed that Petitioner did not understand what he had stipulated to. Dkt. 12 at 55. This analysis seemed to center on the military judge's belief that the Stipulation of Fact was a "confessional stipulation" and that he believed Petitioner had pled to every element of the offense and could not have a defense. *Id.* at 56. Despite counsel for both the Government and Petitioner urging the military judge that there was no problem with the stipulation, the military judge persisted in his beliefs, rejected the stipulation, and immediately declared a mistrial. *Id.* at 60–64.

First, the military judge likely abused his discretion in rejecting the Stipulation of Fact, regardless of whether it was a confessional stipulation or not, because the record does not support that there was a misunderstanding on the part of Petitioner (or the Government for that matter). Pursuant to RCM 811, "the military judge should not accept a stipulation if there is any doubt of the accused's or any other party's understanding of the nature and effect of the stipulation." Here, the triggering event that created an inconsistency in the military judge's mind was the submission of a jury instruction presenting a legal theory of mistake of fact. *Id.* at 47.

A jury or panel instruction is a statement of the law of the case. Instructions "state what the jury must believe from the evidence ... in order to return a verdict in favor of the party who bears the burden of proof." *James v. Kentucky*, 466 U.S. 341, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984); *see also* 23A C.J.S. Criminal Law § 1760. It is difficult to understand how the submission of an instruction on the law could, before any evidence was submitted by Petitioner, create a conflict with a stipulation of fact. Petitioner's understanding and beliefs as to the relevant law governing his court martial were not the subject of the Stipulation of Fact. In fact, Petitioner had reserved his right to persist in his belief that previous motions (including those involving the illegal war defense) had been decided incorrectly by the explicit terms of the Stipulation of Fact. Dkt. 14 at 11.

Furthermore, the military judge rejected the stipulation based on the same information and understanding as he had determined he could accept it before jeopardy attached. Counsel for Petitioner explained Petitioner's belief that the charge of missing movement required a showing of specific intent before the stipulation was accepted. Dkt. 12 at 4–6. Petitioner explained his understanding as to the issue of intent to the military judge before the stipulation was accepted. *Id.* at 17. Petitioner stated the following:

> Sir, my intent, as I stated in public statements and as I stated to my chain of command numerous times, was that the order to deploy to Iraq to support combat operations in OIF was to me, as I believed in the facts and evidence that I saw, was an illegal order. And that the war itself was illegal, and any participation of mine would be contrary to my oath, and therefore I would have no other choice but to refuse. So my intent was to refuse the order sir.

*Id.* Furthermore, Petitioner's statements reported in the stipulation expounded on and reiterated exactly this view of his intent and his belief about his duty to deploy. Dkt. 14 at 11–22. During the second inquiry, Petitioner responded to the question of his intent as follows:

> Your Honor, in that sentence, Paragraph 4, what I was saying is that I intentionally missed the movement because I believed my participation in the war in Iraq would contribute to war crimes, and it would be contributing to what I believed an illegal war. ·

Dkt. 12 at 50. Petitioner further stated:

> Your Honor, I have always believed, especially at this point in time, that I had a legal and moral defense. I realize that the government has made arguments contrary to that, and you've also made rulings contrary to that. It still does not negate my belief that I still have a defense.

*Id.* at 51. The military judge believed, at the time that he accepted the stipulation, that Petitioner understood the nature and effect of the stipulation and that Petitioner was reserving his position on the legality of the order to make movement. *Id.* at 24. Based on this belief, the military judge accepted the stipulation into the record. *Id.* Then, upon Petitioner articulating the same understanding as when the stipulation was accepted, namely that he understood how the stipulation could be used based on the military judge's rulings, and espousing the same beliefs regarding his intent as when the stipulation was accepted, the military judge rejected the stipulation. For this reason, the record indicates that the military judge likely abused his discretion in rejecting the Stipulation of Fact midway through the court martial.

Furthermore, if there was a misunderstanding on the part of Petitioner, it was apparent at the time the stipulation was accepted, before jeopardy had attached. In *U.S. v. Sammaripa,* 55 F.3d 433 (9th Cir.1995), the court found that there was no manifest necessity for declaring a mistrial where the error, which was created by defendant's counsel, was apparent before jeopardy attached. In the instant matter, any misunderstanding or conflicting position Petitioner may have had with the Stipulation of Fact was apparent before jeopardy attached. Like in *Sammaripa,* the alleged misunderstanding therefore cannot create a manifest necessity to declare a mistrial.

Second, the military judge likely abused his discretion in rejecting the Stipulation of Fact because the record does not support the conclusion that the stipulation was a "confessional stipulation." "[W]here a stipulation constitutes an acknowledgment of guilt" the trial judge must "ascertain from the accused on the record that a factual basis exists for the stipulation." *U.S. v. Bertelson,* 3 M.J. 314, 317 (C.M.A. 1977). In *Bertelson,* the accused "had stipulated to the truth of every inculpatory fact charged against him." *Id.* at 315. The court noted that its analysis (requiring inquiry into the factual basis of the stipulation) would have been different had the accused presented a defense to the charges, but because he did not do so, "his stipulation admitted every essential fact and amounted to a confession of guilt." *Id.* In this case, the military judge believed that Petitioner had stipulated to every element of the offense of missing movement. However, even if, by stipulating to the facts which the panel could find sufficient to prove every element of the offense of missing a movement, that would not automatically be determinative of the issue of whether the stipulation was confessional or not. There is a difference between stipulating to every fact sufficient to prove every element of a charge and stipulating to

every element. The latter is a de facto guilty plea. The military judge confused the parties agreement to enter into a stipulation of fact with essentially a stipulation of guilt.

Post-*Bertelson* military case law attempted to more clearly define when a stipulation to facts becomes a "confessional stipulation." The court in *U.S v. Hagy*, 12 M.J. 739, 746 (A.F.C.M.R.1981) stated:

> [W]hen a factual stipulation expressly admits every element of an offense to which the accused has pled not guilty, it does not become a confessional stipulation until the accused, having failed to set forth any affirmative defense, finally rests his case. Certainly a factual stipulation that does not admit every element of an offense to which the accused has pled [not] guilty, unless and until the fact finder draws an inference with respect to an essential element of that offense, does not become a confessional stipulation any sooner.

Here, the military judge rejected the stipulation on the basis that Petitioner was asserting that he had a defense to the charge, before Petitioner could present any evidence to his defense. The proposed panel instruction also presented a possible defense of mistake of fact as to the lawfulness of the order given to deploy. Under these circumstances, the Stipulation of Fact could not conclusively be determined to be a confessional stipulation under *Bertelson* at this stage of the proceedings, and since nothing presented by Petitioner conflicted with anything he had stipulated to in the Stipulation of Fact, the military judge likely abused his discretion in rejecting the stipulation.

Additionally, it is not apparent that Petitioner had stipulated to every element of the offense of missing a movement. It was clear from Petitioner's statements that he believed the offense to be a specific intent crime that required that he intend to disobey a lawful order when he did not board Flight Number BMYA91111173. Petitioner only stipulated that he intentionally did not board the aircraft, but throughout the proceeding maintained that he did not board because he believed that he had a moral and legal obligation not to deploy and therefore did not have the specific intent to disobey a lawful order. The military judge had ruled as a matter of law that this evidence was not relevant and that the facts stipulated to may have been enough for the panel to draw all the required inferences to find that the essential elements had been met, but the record does not reflect that this inference had been drawn, especially where Petitioner had not yet presented his case. The *Bertelson* rule was restated in *U.S. v. Kepple*, 27 M.J. 773, 779 (A.F.C.M.R.1988) as follows: "Unless the stipulation itself admits every element and no further evidence is required from the Government for a finding of guilty, the stipulation is not 'confessional.'" While the military judge, through his pretrial rulings, may have ruled that certain inferences as to elements of the relevant charges could be drawn as a matter of law from the facts stipulated to, the stipulation itself does not appear to admit to every element and was therefore not a "confessional stipulation." The military judge likely abused his discretion in rejecting the Stipulation of Fact midway through the proceedings.

Finally, even if the Stipulation of Fact were a "confessional stipulation," Petitioner did not take a position inconsistent with the stipulation and entered into it for exactly the purpose and use for which "confessional stipulations" are allowed. The determination of whether a stipulation of fact amounts to a "confessional stipulation" only establishes whether the trial judge is required to conduct an inquiry into wheth-

er the defendant has "knowingly, intelligently and voluntarily consented to its admission" and "that a factual basis exists for the stipulation." *Bertelson*, 3 M.J. at 315, 317. Once the trial judge has conducted this inquiry, a reviewing court cannot find error in the acceptance of the stipulation, whether it is determined to be confessional in nature or not. *Id.* For this reason military courts have determined that "prudence dictates conducting a *Bertelson* inquiry prior to accepting any factual stipulation into evidence which amounts to an admission of those inculpatory facts necessary for a conviction." *Kepple*, 27 M.J. at 780; *see also Hagy*, 12 M.J. at 745 n. 10. Had the stipulation later been determined on review to be a "confessional stipulation," despite Petitioner's insistence that it was not, the military judge had insulated the proceedings from reversible error by conducting the *Bertelson* inquiry and, as stated above, Petitioner did not present any facts that conflicted with or contradicted those contained in the Stipulation of Fact.

The military judge apparently viewed the Stipulation of Fact as a guilty plea rather than a confessional stipulation. A guilty plea is distinguished from a stipulation of facts as follows:

[A] guilty plea represents a conscious choice by the accused not to contest any issues relevant to his guilt. It clearly contemplates an immediate announcement of a guilty verdict without the introduction of any evidence. A factual stipulation, on the other hand, is actually an anticipation on the part of all parties that additional evidence contradicting guilt will be admitted into trial prior to findings. Factual stipulations ordinarily reflect such anticipations for two reasons. They either stem from the desire of both parties to separate agreed-upon facts from contested ones so as to insure evidence directly relevant to contested issues is clearly delineated for the fact finder, or they indicate the accused's intent to plead guilty "but for" his desire to preserve contested interlocutory issues for review.

*Hagy*, 12 M.J. at 745. The record reflects that Petitioner entered into this Stipulation of Fact for exactly the purpose stated by the court in *Hagy*. Counsel for Petitioner clearly stated:

This is a stipulation; it's not a guilty plea. It's a stipulation of facts. That is to be judged differently. The impact or the effect of the stipulation, the parties can disagree about. And we apparently do disagree, but Lieutenant Watada's pleading not guilty. He's always made that clear. And yet, he is willing to plead to the facts which he understood could be sufficient on which to find him guilty, as you instructed. He knows that based upon the legal rulings and determinations the court makes. But he still maintains notwithstanding those rulings that he is entitled to plead not guilty for the reasons that he has stated to you.

\* \* \*

What he's said to you in his answers to your questions is that the act of not getting on the plane was not a mistake. He did that deliberately. But he did it for a specific reason out of a specific intent with which the government does not agree and which the government deems to be irrelevant, and which you have ruled is not relevant. That's all he's saying. And he's made that argument from the beginning, long before he actually failed to get on the plane. That's simply our position.

\* \* \*

[H]e's saying what he's saying, which is essentially that he's stipulating as far as

he's able and willing to go with the understanding that the facts to which he's stipulating might be sufficient to dispose of that charge against him based upon the rulings of the court. And that's as far as we can go. And he understands that.

Dkt. 12 at 55–57. Petitioner was thus either preserving the issue of whether the offense was a specific intent crime for appeal, or was attempting to distill the issues down for the Government so that it only had to provide evidence that specific intent was met. Under either view, there was no inconsistency with the stipulation and Petitioner's belief that he had a defense. The military judge likely abused his discretion in rejecting the Stipulation of Fact after the Government had presented its case and before Petitioner was allowed to present his. Neither the Government, nor Petitioner, believed that there was any reason to reject the stipulation and both parties agreed that they had a meeting of the minds as to the contents of the stipulation and its use. Despite both parties insisting that there was not any issue present that would require the rejection of the stipulation (and the record before the Court does not support a contrary position), the military judge rejected the Stipulation of Fact and immediately declared a mistrial. Under these circumstances, the Court finds that Petitioner is likely to prevail on the merits of his double jeopardy claim on the basis that the record does not reflect the requisite high degree of necessity for declaration of a mistrial, and that the military judge likely abused his discretion in rejecting the Stipulation of Fact.

## 2. Even if the Military Judge did not Abuse His Discretion in Rejecting the Stipulation, There is Still a Lack of Manifest Necessity

For the reasons stated above, it is clear that the parties did not believe that there was an issue with the Stipulation of Fact and that they did have a meeting of the minds as to the stipulation's use and effect. Petitioner also believed that he understood the effect and the proposed use of the stipulation. "[T]he trial judge must, before granting a mistrial, determine that an alternative measure, less drastic than mistrial, would not alleviate the problem so as to allow the trial to continue to an impartial verdict." *Ghent,* 21 M.J. at 550. "Even if the trial judge believes in subjective good faith that a mistrial is called for, we must reverse if the record belies his concern." *U.S. v. Meza–Soria,* 935 F.2d 166, 171 (9th Cir.1991). Here, where both parties wanted to continue with the Stipulation of Fact and the pretrial agreement still in place, and where Petitioner did not misunderstand the stipulation's use or effect, allowing the stipulation and continuing with the trial would have been a viable, less drastic alternative to the declaration of a mistrial. Even after the stipulation was rejected, the parties' position as to the stipulation provides evidence that if a continuance would have been granted, the parties may have been able to come to an understanding by which they could have revived the Stipulation of Fact and the pretrial agreement. Furthermore, the military judge may have been able to reconsider his ruling after further review of the case law discussing "confessional stipulations." This court finds that all of these alternatives would have been less drastic and more desirable than the declaration of a mistrial, and would have alleviated any problem, thereby allowing the trial to continue to an impartial verdict. The record does not reflect, and the Government likely cannot carry its burden of showing, that there was manifest necessity for declaring a mistrial because reasonable alternatives were available. Therefore, Petitioner is

likely to prevail on the merits of his double jeopardy claim even under an abuse of discretion standard.

### 3. The Military Judge Failed to Adequately Consider Possible Alternatives

An explicit finding of manifest necessity is not required as long as the record is sufficient to justify the conclusion that manifest necessity was present. *Arizona v. Washington*, 434 U.S. at 516–17, 98 S.Ct. 824. However, courts have found that the failure of the judge to even consider feasible alternatives to mistrial may demonstrate a lack of manifest necessity. *Ghent*, 21 M.J. at 550; *U.S. v. Sanders*, 591 F.2d 1293, 1299 (9th Cir.1979).

> [W]hen the judge explains his or her reasons for declaring a mistrial, the record must support the explicit or implicit finding of "manifest necessity." This is especially true when the judge makes a Sua sponte [sic] ruling over the defendant's objection. When the record ... reveals that the judge failed adequately to consider feasible alternatives to a mistrial, then the decision to declare a mistrial may be reversed by a reviewing court, despite the high degree of deference to be accorded the conclusions of the trial judge in such cases.

*Sanders*, 591 F.2d at 1299.

In the instant matter, the military judge made no inquiry whatsoever into any feasible alternatives to the declaration of a mistrial. Counsel for Petitioner warned the military judge that jeopardy had attached and that if a mistrial was being contemplated, an inquiry into alternatives was required. Dkt. 16–2 at 4. Despite this warning, the record does not reflect the military judge's consideration of any alternatives to declaring a mistrial. Instead, the following exchange took place:

[MILITARY JUDGE]: Government, what's your druthers? At this point, I certainly entertain a motion for mistrial and I'll set a new trial date. At this point, I believe there is a breach of the pretrial agreement, which would allow the government to resurrect the additional charges that were dismissed because we have not reach[ed] the determination point, as required, for a dismissal with prejudice. I believe the government was, at 802, asking about the [intent] element that's in there. But if you review the entirety of the stipulation of fact, that I think even a casual reading of the stipulation—every statement in there goes to the, "I do not intend to deploy." I don't know how we get around that. What we're left with is I can instruct the members, if the government wishes to go forward. I know the government does not have all their witnesses that they would have called for the other offenses. So, government, what's your choice?

[GOVERNMENT]: Your Honor, at this point, the government moves for mistrial.

[MILITARY JUDGE]: Defense, do you want to be heard?

[COUNSEL FOR PETITIONER]: Yes. We would oppose the motion.

[MILITARY JUDGE]: Counsel, I have the week of 19 March available.

[COUNSEL FOR PETITIONER]: Can we first determine, are you declaring a mistrial?

[MILITARY JUDGE]: I'm going to declare a mistrial.

Dkt. 12 at 62–63. This brief exchange hardly depicts a process of weighing feasible alternatives.

There may, in fact, have been other feasible alternatives available at the time mistrial was declared beyond those mentioned here. Because no alternatives were

discussed or entertained, it is difficult to speculate as to what alternatives were available. However, given the record before it, this Court finds it likely that the military judge did not consider any feasible alternatives to the declaration of a mistrial. Petitioner is likely to succeed at demonstrating that the military judge acted "irrationally, irresponsibly, precipitately" and abused his "discretion, [therefore] his decision to grant a mistrial cannot be condoned." *Ghent,* 21 M.J. at 550.

## C. Balance of Potential Harms Weighs in Favor of Petitioner

Having determined that Petitioner is likely to succeed on the merits of his double jeopardy claim and that if the court martial were to proceed, Petitioner would be irreparably harmed, the Court must now weigh this potential harm against any potential harm that may be suffered by the military.

> The military is "a specialized society separate from civilian society" with "laws and traditions of its own [developed] during its long history." Moreover, "it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise." To prepare for and perform its vital role, the military must insist upon a respect for duty and discipline without counterpart in civilian life. The laws and traditions governing that discipline have a long history; but they are founded on unique military exigencies as powerful now as in the past. Their contemporary vitality repeatedly has been recognized by Congress.

*Councilman,* 420 U.S. at 757, 95 S.Ct. 1300 (citations omitted). Respondents argue that if the Court issues an injunction, it "would be a disruptive force as to affairs peculiarly within the jurisdiction of the military authorities." *Orloff v. Willough-*

*by,* 345 U.S. 83, 95–95, 73 S.Ct. 534, 97 L.Ed. 842 (1953). However, *Parisi, Councilman,* and *Callaway* all show that where certain criteria are met, as is the case in the instant matter, the Court may issue an injunction. Also, this case concerns an alleged violation of the Fifth Amendment Double Jeopardy Clause, which cannot be said to fall within a set of affairs that are peculiar to the jurisdiction of the military authorities.

Furthermore, if an injunction is issued, it would in no way impinge on the military's ability to fight and be ready to fight wars or discipline its soldiers. Such a ruling would be limited in scope to cases where a double jeopardy claim is likely to prevail on its merits and only after all military court remedies had been exhausted. In this limited context, the precedential effect of an injunction would only serve to vindicate servicemen's Fifth Amendment rights while allowing the military to discipline its soldiers as it sees fit and military appellate courts to review all the claims arising within its jurisdiction. In this context, where Petitioner's potential harm is irreparable, the balance of potential harms weighs in favor of issuing a preliminary injunction over Petitioner's upcoming court martial.

## D. Public Interest Favors Granting Relief

There is a strong military and public interest in protecting individuals from being subjected to double jeopardy, as shown by the Framers' inclusion of this right in the Fifth Amendment and its inclusion in the Uniform Code of Military Justice Article 44(a) and 10 U.S.C. § 844(a). Having found that this decision will in no way infringe on the military's ability to fight and be ready to fight wars or to discipline its soldiers, public interest in this matter

strongly favors upholding Petitioner's constitutional rights.

Respondents do not contest that an Article III court would be able to take up this matter after the second court martial had concluded; they instead ask that this Court allow a possible Fifth Amendment violation to occur and then conduct habeas review after the injury has already been suffered, even where Petitioner has exhausted all of his military remedies on the issue. Dkt. 11 at 8. The same Fifth Amendment protections are in place for military service members as are afforded to civilians. *Wade v. Hunter*, 336 U.S. 684, 690, 69 S.Ct. 834, 93 L.Ed. 974 (1949). There is a strong public interest in maintaining these rights inviolate for civilian and servicemen alike, including Petitioner. To hold otherwise would ignore the many sacrifices that American soldiers have made throughout history to protect these sacred rights. For this reason, the public interest favors granting a preliminary injunction over Petitioner's upcoming court martial.

## VII. CONCLUSION

This court has jurisdiction of this petition for habeas corpus under 28 U.S.C. § 2241. While the remedy sought by Petitioner is rare, it is available in limited circumstances, and those circumstances are present here. Petitioner has shown that he will suffer irreparable harm, that there is a likelihood to prevail on the merits, that the balancing of potential harms weighs in favor of Petitioner, and that the public interest favors granting Petitioner's requested relief; therefore, a preliminary injunction should issue. No bond will be required. See *Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir.2000).

The Court has not received briefing from either Petitioner or Respondents, nor does the record clearly indicate how this decision affects the double jeopardy analysis with respect to the charges dismissed without prejudice pursuant to the pretrial agreement or whether those charges were effectively included in the first court martial by virtue of the military judge's attempt to resurrect the charges. Therefore, the Court does not attempt to decide those issues here.

## VIII. ORDER

Therefore, it is hereby

**ORDERED** that Petitioner's Emergency Motion for a Stay of Court Martial Proceedings (Dkt.2) is **GRANTED.** A preliminary injunction is hereby **ORDERED** over the court martial proceeding referred by Respondent Jacoby and shall remain in effect until the conclusion of this habeas corpus proceeding or until further proceedings result in a modification or dissolution of the preliminary injunction.